## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Joyce Weru<br>1520 Sherwood Ct.<br>Hyattsville, MD 20785<br>　　　Plaintiff, | ) ) ) ) ) ) | |
| v. | ) ) | Case No. _____<br>**JURY TRIAL DEMANDED** |
| ACDI/VOCA<br>　　50 F Street NW<br>　　Washington, DC 20001<br>　　Defendant. | ) ) ) ) | |

### COMPLAINT

**COMES NOW**, Plaintiff Joyce Weru ("Ms. Weru"), by and through counsel, pursuant to

the Federal Rules of Civil Procedure, and for her causes of action against Defendant

ACDI/VOCA, alleges as follows:

### I. INTRODUCTION

1.　　This is a civil action brought under 42 U.S.C. § 1981, the Constitution of the United

States, and the Constitution and laws of the District of Columbia, seeking compensatory, special,

consequential, and punitive damages, and such other related relief as the Court deems proper for

violation of the civil rights, privileges, and immunities of the Plaintiff, and for other injuries of

and to the Plaintiff, further asking for reasonable attorneys fees as allowed by 42 U.S.C. § 1988

and litigation costs, for injuries caused to Plaintiff.  Plaintiff's injuries were proximately caused

by Defendant's acts, actions, conduct or omissions, and were the result of intentional, malicious,

deliberate indifference and/or reckless disregard for the Plaintiff's rights.

## II. JURISDICTION AND VENUE

2.       This action arises under the United States Constitution, under federal law, 42 U.S.C. §

1981.

3.       This Court has original jurisdiction over Plaintiff's civil rights claims by operation of 28

U.S.C. §§ 1331 and 1343.

4.       Venue is proper pursuant to 28 U.S.C. § 1391 in the United States District Court for the

District of Columbia because all or a substantial part of the events or omissions on which

Plaintiff's claims herein are based occurred in Washington, D.C.

5.       This Court is authorized to award nominal damages under 28 U.S.C. § 1343(a)(4).

6.       This Court is authorized to award attorney's fees and related expert fees under 42 U.S.C.

§ 1988(b) and 1988(c).

7.       No administrative exhaustion or other conditions precedent are required prior to the filing

of claims under 42 U.S.C. § 1981.

## III. PARTIES

8.       Plaintiff Joyce Weru ("Ms. Weru") is a Black woman of Kenyan national origin.  Plaintiff

is a member of a protected class recognized as Black or African-American and is a member of a

protected class recognized as Kenyan national origin.

9.       Defendant ACDI/VOCA is a non-profit entity with its principal place of business at 50 F

Street Northwest Suite 1000, Washington, DC 20001.

## IV. STATEMENT OF FACTS

### A.       JOYCE WERU'S EMPLOYMENT WITH ACDI/VOCA

10.      Joyce Weru, a senior certified human resources professional, was hired by ACDI/VOCA

on or about August 16, 2017 as Human Resources Director.

2

11.    Ms. Weru was instrumental in overhauling and improving nearly every aspect of the ACDI/VOCA Human Resources Department.

12.    During her tenure as the Human Resources Director at ACDI/VOCA, Ms. Weru was a member of several ACDI/VOCA strategic organizational steering committees, including the Harassment Prevention Group, and co-leader of the Employee Handbook Revamp Steering Committee and the Human Resources Information Systems Revamp Steering Committee.

13.    As Human Resources Director, Ms. Weru made significant contributions to the Headquarters X-D Management Group, which was instrumental in improving employee/management relations and bottom-up management at ACDI/VOCA.

14.    As Human Resources Director, Ms. Weru led a Manager Meet-Up Group, a novel platform for ACDI/VOCA managers to learn critical management and leadership skills.

15.    As Human Resources Director, Ms. Weru integrated automated processes into the ACDI/VOCA salary and merit increase systems, substantially reducing ACDI/VOCA's administrative workload and saving the organization from expending resources on consulting fees.

16.    Ms. Weru accomplished the above-described achievements despite the departure of two other key human resources employees, whose work she took on herself.

17.    Until the date of her termination, Ms. Weru received exceptional annual reviews and full merit increases in pay annually.

18.    In or about February of 2020, Ms. Weru started a company called Rise Above Coaching, an executive leadership coaching business with the goal of amplifying diversity and inclusion in leadership and racial equality in the workplace.

3

19.     ACDI/VOCA paid a portion of Ms. Weru's tuition to attend the Georgetown University

Executive Leadership Coaching Program.

20.     During Ms. Weru's tenure as Human Resources Director at ACDI/VOCA, Quanita

Pokolo-Hassell, Vice President of Human Resources, was Ms. Weru's first level supervisor.

Sylvia Megret, Chief Operations Officer, was Ms. Weru's second level supervisor.

### B.     ACDI/VOCA IMPROPERLY REMOVED JOYCE WERU'S JOB DUTIES AND THEN TERMINATED JOYCE WERU'S EMPLOYMENT FOR RAISING ISSUES OF RACIAL JUSTICE AND EQUALITY

21.     On or about June 3, 2020, an email was sent to all ACDI/VOCA staff by Charles J. Hall,

President and CEO of ACDI/VOCA, a white male of caucasian descent, regarding

ACDI/VOCA's position on the Black Lives Matter movement.

22.     Mr. Hall's email included excerpts from Dr. Martin Luther King Jr.'s "I have a dream"

speech, and tied Dr. King's words to ACDI/VOCA's "Core Values," which do not discuss racial

justice in any way.

23.     On June 8, 2020, Ms. Weru sent an e-mail to Mr. Hall raising concerns about the content

of Mr. Hall's June 3, 2020 e-mail and about ACDI/VOCA's treatment of female Black

employees.

24.     Ms. Weru's June 8, 2020 email included criticism of ACDI/VOCA's executive leadership

team, which is composed entirely of white men and women, speaking on behalf of Black

employees rather than allowing the Black employees to speak for themselves.  Ms. Weru's email

was also critical of the use of a quote by Martin Luther King, which she said was

"heartbreaking" and "amplified white privilege."

25.     Ms. Weru's June 8, 2020 email also included criticism of Sylvia Megret's treatment of

Ms. Weru's supervisor, Quanita Pokolo-Hassell, the only other Black woman in a leadership

position at ACDI/VOCA. Specifically in regards to Sylvia Megret's treatment of Ms.

Pokolo-Hassell, Ms. Weru stated: "Sylvia, you break her down, take her shine away, and dull her

brilliance."

26.     A meeting between Ms. Weru and Mr. Hall was arranged and held remotely via Microsoft

Teams because of the COVID-19 pandemic. During this meeting Ms. Weru told Mr. Hall she did

not send the June 8, 2020 email to the entire executive team because she feared retaliation and

that she would be fired.

27.     On July 13, 2020, Humentum, a Washington, DC-based global management professional

association, announced they would hold a webinar hosted by Joyce Weru titled "How Human

Resources Can Support Racial Equity Conversations."

28.     In response to this announcement, Sylvia Megret emailed Ms. Weru and then scheduled a

Microsoft Teams meeting for Ms. Megret, Ms. Weru, and ACDI/VOCA General Counsel Luke

Pingel to discuss the webinar. This meeting was held on or about July 15, 2020.

29.     During Ms. Megret's Microsoft Teams meeting, Ms. Megret told Ms. Weru that Ms.

Weru's work with Humentum was a conflict of interest with ACDI/VOCA.

30.     Ms. Weru's work with Humentum was not a conflict of interest with ACDI/VOCA.

31.     Ms. Megret's statement that Ms. Weru's work with Humentum was a conflict of interest

was untrue.

32.     Ms. Megret's statement that Ms. Weru's work with Humentum was a conflict of interest

was in violation of ACDI/VOCA's own policies and practices.

33.     Ms. Megret's statement that Ms. Weru's work with Humentum was a conflict of interest

was motivated by Ms. Weru's race and national origin, and was discriminatory and retaliatory.

34.     Upon information and belief, ACDI/VOCA has never informed any non-Black employee that working with a professional association was a conflict of interest.

35.     During the aforementioned Microsoft Teams meeting, Ms. Megret demanded that Ms. Weru cancel her webinar on racial equity.

36.     Ms. Megret's demand that Ms. Weru cancel her webinar on racial equity was motivated by race; discriminatory and retaliatory; and in violation of ACDI/VOCA's own policies and practices.

37.     Upon information and belief, ACDI/VOCA has never demanded any non-Black employee cancel a webinar.

38.     During the aforementioned Microsoft Teams meeting, Ms. Megret demanded that Ms. Weru refuse to accept a role as Human Resources Ambassador with Humentum.

39.     Ms. Megret's demand that Ms. Weru refuse to accept a role as Human Resources Ambassador with Humentum was motivated by Ms. Weru's race and national origin, and was discriminatory and retaliatory.

40.     Ms. Megret's demand that Ms. Weru refuse to accept a role as Human Resources Ambassador with Humentum was in violation of ACDI/VOCA's own policies and practices.

41.     Upon information and belief, ACDI/VOCA has never demanded any non-Black employee refuse a role with a professional association.

42.     During the aforementioned Microsoft Teams meeting, Ms. Megret demanded that Ms. Weru completely sever her relationship with Humentum.

43.     Ms. Megret's demand that Ms. Weru completely sever her relationship with Humentum was motivated by Ms. Weru's race and national origin, and was discriminatory and retaliatory.

44.     Ms. Megret's demand that Ms. Weru completely sever her relationship with Humentum was in violation of ACDI/VOCA's own policies.

45.     Upon information and belief, ACDI/VOCA has never demanded any non-Black employee completely sever their relationship with a professional association.

46.     During the aforementioned Microsoft Teams meeting, Ms. Megret informed Ms. Weru that Ms. Megret and Ms. Pingel would choose who the new Humentum Human Resources Ambassador will be.

47.     Operatively, this was a removal of Ms. Weru's Human Resources Director job duties by Ms. Megret.

48.     Ms. Megret's removal of Ms. Weru's Human Resources Director job duties was motivated by Ms. Weru's race and national origin, and was discriminatory and retaliatory.

49.     Ms. Megret's removal of Ms. Weru's Human Resources Director job duties was in violation of ACDI/VOCA's own policies and practices.

50.     Upon information and belief, ACDI/VOCA has never removed human resources job duties in this manner from any non-black employee.

51.     As a result of Ms. Megrets unreasonable, discriminatory, and retaliatory demands, Ms. Weru felt shame, humiliation, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

52.     During the Microsoft Teams meeting, Ms. Weru asked Ms. Megret to memorialize the meeting in writing.

53.     Ms. Megret refused to memorialize the meeting in writing.

54.     Following the July 15, 2020 meeting, Ms. Weru contacted her supervisor Ms. Pokolo-Hassell, to update her on Ms. Megret's demands and changes to Ms. Weru's job duties.

55.     Ms. Pokolo-Hassell informed Ms. Weru that she had not been informed of the meeting or any of the demands or changes that Ms. Megret dictated, and had no knowledge of the meeting occurring.

56.     Ms. Pokolo-Hassell informed Ms. Weru that she would follow up with Ms. Megret and Mr. Pingel.

57.     During the July 15, 2020 Microsoft Teams Meeting and again in another meeting on or about July 16, 2020, Ms. Megret and Mr. Pingel questioned Ms. Weru about a discrepancy on her ACDI/VOCA credit card statement dating back approximately one year to July 2019.

58.     This credit card discrepancy occurred because Ms. Weru accidentally used her ACDI/VOCA credit card instead of her personal credit card to purchase furniture from a Marlo Furniture store ("the Marlo charges").

59.     Prior to Ms. Weru's termination from ACDI/VOCA, Ms. Weru was not aware she had used her ACDI/VOCA card accidentally and believed the charges to be fraudulent.

60.     Ms. Weru's belief the charges were fraudulent were reinforced because there were other fraudulent charges on her ACDI/VOCA credit card statement for July 2019.

61.     On or about July 16, 2020, Mr. Pingel and Ms. Weru met via Microsoft Teams.

62.     During this meeting, Mr. Pingel again raised the issue of Ms. Weru's credit card discrepancy.

63.     Subsequent to the July 16, 2020 meeting, Mr. Pingel sent Ms. Weru a Settlement Agreement wherein Ms. Weru would release all claims against ACDI/VOCA in exchange for ACDI/VOCA "agree[ing] to forebear pursuing the collection of [Ms. Weru's] unauthorized credit card charge with a present value in excess of TWO THOUSAND DOLLARS and ZERO CENTS ($2,000.00)"

8

64.     The Settlement Agreement includes provisions wherein Ms. Weru would affirm that she has not been retaliated against for reporting any wrongdoing by ACDI/VOCA or its employees, managers, or officers, including any allegations of corporate fraud.

65.     Ms. Weru was given twenty four hours to review the Settlement Agreement and accept it, despite the agreement itself saying it had a twenty-one day consideration period, and a seven day revocation period after signing.

66.     When Mr. Pingel sent Ms. Weru the Settlement Agreement, Mr. Pingel did not tell Ms. Weru that her continued employment was contingent on signing the Settlement Agreement.

67.     When Mr. Pingel sent Ms. Weru the Settlement Agreement, Mr. Pingel did not tell Ms. Weru that she was being terminated.

68.     ACDI/VOCA had no reason other than the realization that it had discriminated and retaliated against Ms. Weru and was continuing to discriminate and retaliate against Ms. Weru to offer Ms. Weru a Settlement Agreement wherein Ms. Weru would give up her right to sue ACDI/VOCA for discrimination and retaliation in exchange for approximately two thousand dollars of forbearance on her corporate credit card.

69.     At no time did ACDI/VOCA request Ms. Weru pay back the unauthorized credit card charge amount.

70.     Upon information and belief, ACDI/VOCA has never offered a Settlement Agreement to a non-Black employee wherein ACDI/VOCA would forego collection of an unauthorized credit card charge in exchange for a general release by that employee.

71.     Ms. Weru, in response to receiving the Settlement Agreement, told Mr. Pingel that the Settlement Agreement, along with Ms. Merget's demands at the July 15, 2020 meeting, were discriminatory and retaliatory.

9

72. Ms. Weru, in response to receiving the Settlement Agreement, told Mr. Pingel that she wished to file an ethics complaint and a discrimination complaint with ACDI/VOCA.

73. Immediately following the July 16th, 2020 Microsoft Teams meeting, ACDI/VOCA disabled Ms. Weru's login credentials, preventing her from making an ethics complaint or a discrimination complaint.

74. On July 17, 2020, ACDI/VOCA terminated Ms. Weru's employment for "misuse of [her] corporate credit card for personal gain, and for knowing and repeated misrepresentation of the facts regarding [her] corporate card."

75. As described above and discussed further below, the reason given for Ms. Weru's termination was wholly pretextual, discriminatory, retaliatory, and had no legitimate business purpose.

### C. ACDI/VOCA'S RATIONALE FOR TERMINATING MS. WERU IS DEMONSTRABLY PRETEXTUAL

76. ACDI/VOCA provided corporate credit cards to some of its employees to use for business expenses.

77. ACDI/VOCA lacks a cohesive and meaningful policy regarding the use of corporate credit cards.

78. To the extent that ACDI/VOCA does have a corporate credit card policy, it is not enforced.

79. To the extent that ACDI/VOCA does enforce its corporate credit card policy, it is not uniformly enforced.

80. ACDI/VOCA has never terminated any non-Black employee for alleged misuse of a corporate credit card.

10

81.    ACDI/VOCA corporate credit card accounts are billed directly to the employee cardholder, not to ACDI/VOCA, and the employee is responsible for paying the corporate credit card balance directly.

82.    An employee cardholder wishing to be compensated for expenses charged on their corporate credit card must submit expense reports to ACDI/VOCA.

83.    ACDI/VOCA's expense repayment to employees for corporate credit card charges is inconsistent, irregular, and untimely.

84.    As a result, ACDI/VOCA employees do not always pay their corporate credit card charges on time, as employees are not always reimbursed for their expenses in a timely manner.

85.    Ms. Weru used her ACDI/VOCA credit card to pay for one annual conference, and small work-related expenses such as transportation and meals related to Human Resources events she organized on behalf of ACDI/VOCA.

86.    Because Ms. Weru's corporate card spending was so sparse, she did not always review her monthly statements.

87.    ACDI/VOCA switched its corporate credit card statements from monthly paper statements to online statements in 2019.

88.    Ms. Weru had grown accustomed to collecting and reviewing her paper statements, and did not review her online statements regularly.

89.    Because of ACDI/VOCA's irregular expense reimbursement procedures, Ms. Weru often did not look at her corporate credit card statements at all, instead simply paying lump sum amounts once ACDI/VOCA reimbursed her for her submitted expenses.

90.    Ms. Weru never submitted an expense reimbursement request for the accidental use of her corporate credit card to purchase furniture at Marlo Furniture.

89.     On July 20, 2019, Ms. Weru purchased furniture from a Marlo Furniture store through a lease-purchase agreement.

90.     A lease purchase agreement requires a down payment and then installment payments.

91.     Ms. Weru inadvertently gave her corporate credit card to Marlo Furniture for the down payment, which was charged as her order was fulfilled, once for $1,711.48 on July 20, 2019, and then on July 28, 2019 for $1,263.52.  Marlo Furniture subsequently refunded $450.50 for a returned item.

92.     In November, 2018, Ms. Weru and her family were victims of a house fire that destroyed their home and nearly all their possessions.

93.     Ms. Weru and her children were displaced for over six months before moving back into their rebuilt house, which required purchasing all new furniture.

94.     Ms. Weru spent nearly $15,000.00 replacing items lost in the fire, using several credit cards as well as a loan against her 401k through ACDI/VOCA's 401k manager Voya Financial.

95.     Ms. Weru's mistake was entirely innocent, and due to the volume of personal transactions she was managing with respect to replacing her family's lost property, she did not realize the Marlo Furniture purchase had been made on her corporate credit card.

96.     Prior to purchasing the furniture, Ms. Weru contacted Janelle Brown, ACDI/VOCA's Director of Benefits, to notify her of the aforementioned 401K loan, specifically stating that she was going to purchase furniture, but that she was short on funds because of issues with her insurance company.

97.     Ms. Weru made no attempt to hide the fact that she was purchasing furniture.

98.     It would be against Ms. Weru's self-interest to disclose the nature of her alleged misuse of her corporate credit card to her employer if she was truly attempting to misuse her corporate credit card.

99.     ACDI/VOCA and Ms. Weru remained unaware of the Marlo charges until approximately April, 2020.

100.    In April, 2020, Ms. Weru first learned of the Marlo charges via an email from her supervisor, Ms. Pokolo-Hassell.

101.    In this email, Ms. Weru's supervisor asked ACDI/VOCA's accounting department to review the last six months of Ms. Weru's purchases on her corporate credit card.

102.    ACDI/VOCA found nothing improper in Ms. Weru's use of her credit card for the prior six months.

103.    Ms. Weru responded to her supervisor that she wished to dispute the Marlo charges, as she believed they were fraudulent.

104.    Ms. Weru had a good faith basis for believing the Marlo charges were fraudulent, as all the other charges on Ms. Weru's July 2019 corporate credit card statement were also fraudulent.

105.    Ms. Weru explained to her supervisor why and how she knew the other charges were fraudulent - they were Uber charges in Washington, DC on days when she was not in Washington, DC, and to and from places she has never visited.

106.    Because all the other charges on Ms. Weru's July 2019 corporate credit card statement were fraudulent, Ms. Weru simply assumed that the Marlo charges were fraudulent as well.

107.    Ms. Weru was diligent in attempting to dispute the charges on her corporate card, but ACDI/VOCA refused to take any action to assist her.

108. On or about April 30 and May 5, 2020, Ms. Weru contacted Hygie Vibar, ACDI/VOCA's Vice President and Controller, and Alexander Goodspeed, ACDI/VOCA's Director of Treasury, and received contact information for ACDI/VOCA's Bank of America Corporate Account Manager.

109. Upon contacting the Bank of America Corporate Account Manager, Ms. Weru was informed that because of the age of the transactions, Bank of America could not open an investigation into the fraudulent charges.

110. Bank of America further informed Ms. Weru that they could not discuss the matter with her further, and could only speak to Mr. Goodspeed or Ms. Vibar as they were the persons of authority on ACDI/VOCA's accounts.

111. Upon learning this, Ms. Weru contacted Mr. Goodspeed and Ms. Vibar on or about June 11, 2020, to inform them that their involvement was needed to resolve the matter with Bank of America.

112. Ms. Weru received no reply to her June 11, 2020 email requesting ACDI/VOCA's assistance.

113. Ms. Weru received no other communication regarding the Marlo charges or the fraudulent charges on her corporate credit card account until Sylvia Merget and Luke Pingel re-raised the issue in response to Ms. Weru's concerns about racial discrimination at ACDI/VOCA.

114. Mr. Pingel only raised the issue of the Marlo charges with Ms. Weru in response to Ms. Weru's complaints about racism and racial discrimination at ACDI/VOCA.

115. Ms. Weru feared that if she spoke up about issues of race at ACDI/VOCA, she would lose her job.

14

116.   Ms. Weru stated that she was afraid that she would lose her job for speaking up in her email to ACDI/VOCA President Charles Hall on or about June 8, 2020.

117.   Prior to the meetings between Ms. Weru, Ms. Merget, and Mr. Pingel on July 15 and July 16, 2020, in the course of an unrelated reduction in force program, ACDI/VOCA leadership participated in a training session that included discussions of why and how to avoid unacceptable high-pressure communications and illegally coercive tactics that would create employment discrimination liablity exposure for ACDI/VOCA.

118.   Sylvia Merget and Luke Pingel attended the aforementioned training, and were aware that their actions on July 15 and July 16, 2020 were not only unacceptable, not only in violation of ACDI/VOCA policies, but also knew that what they were doing was a violation of Ms. Weru's constitutional and civil rights.

119.   ACDI/VOCA's stated reason for terminating Ms. Weru's employment is mere pretext.

120.   ACDI/VOCA has never terminated a non-Black employee for misuse of their corporate credit card.

121.   ACDI/VOCA has never terminated a non-Black employee for misuse of their corporate credit card rather than offering them an opportunity to pay the unauthorized charges on their corporate credit card.

122.   Ms. Weru's race was a motivating factor in ACDI/VOCA's decision to remove her job duties and terminate her employment.

123.   ACDI/VOCA retaliated against Ms. Weru by terminating her after she raised race-based issues with ACDI/VOCA management.

## V. DAMAGES

124.    Because of statutorily impermissible, willful, and malicious acts by ACDI/VOCA and its

representatives and agents, Ms. Weru has suffered loss of income, loss of benefits, loss of career

opportunity, loss of career investment, and loss of advancement pursuant to 42 U.S.C. § 1981.

125.    As a consequence of the unlawful and outrageous actions of ACDI/VOCA, Ms. Weru has

suffered humiliation, loss of standing in the community, emotional pain and suffering,

inconvenience, loss of enjoyment of life, irritation and mental anguish.

126.    Ms. Weru seeks recovery, compensatory, and equitable (i.e., back pay and

front pay) damages, as well as attorney's fees, and costs and pre and post judgment

interest in the maximum amounts allowed by law pursuant to 42 U.S.C. § 1981,  42 U.S.C. §

1988(b), and 42 U.S.C. § 1988(c).

## COUNT 1: RACE-BASED DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

127.    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs

as if fully set forth herein.

128.    Plaintiff is a member of a protected class and racial minority by virtue of her race,

referred to as Black or African-American.

129.    Plaintiff is a member of a protected class and racial minority by virtue of her being of

Kenyan national origin.

130.    By removing Plaintiff's job duties in the July 15, 2020 meeting, Defendant denied

Plaintiff the rights guaranteed to her under 42 U.S.C. § 1981, which ensures that all persons

"shall have the same right . . . to make and enforce contracts," which is defined by 42 U.S.C. §

1981, to be "the making, performance, modification, and termination of contracts, and the

enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

16

130.    By terminating Plaintiff's employment, Defendant denied Plaintiff the rights guaranteed

to her under 42 U.S.C. § 1981, which ensures that all persons "shall have the same right . . . to

make and enforce contracts," which is defined by 42 U.S.C. § 1981, to be "the making,

performance, modification, and termination of contracts, and the enjoyment of all benefits,

privileges, terms, and conditions of the contractual relationship."

131.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in

violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer monetary and/or

economic damages, including, but not limited to, loss of past and future income, compensation

and benefits for which she is entitled to an award of monetary damages and other relief.

132.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in

violation of  42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer severe mental

anguish and emotional distress, including, but not limited to, depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain

and suffering for which she is entitled to an award of monetary damages and other relief.

133.    Defendant's unlawful discriminatory conduct constitutes a willful and wanton

violation of 42 U.S.C. § 1981, was outrageous and malicious, was intended to injure Plaintiff,

and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of

punitive damages.

## COUNT 2: RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

134.    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs

as if fully set forth herein.

135.    Defendant violated 42 U.S.C. § 1981 by subjecting Plaintiff to retaliation for

her protected complaints for issues of racism at ACDI/VOCA by, *inter alia*, removing her job duties in the July 15, 2020 meeting.

136.    Defendant violated 42 U.S.C. § 1981 by subjecting Plaintiff to retaliation for her protected complaints for issues of racism at ACDI/VOCA by, *inter alia*, terminating Plaintiff's employment with ACDI/VOCA.

137.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

138.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

139.    Defendants' unlawful discriminatory conduct constitutes a willful and wanton violation of 42 U.S.C. § 1981, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

      A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

G.      An award of punitive damages;

H.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial for all issues.

Attorney for Plaintiff
Ardra O'Neal, Esq. (Bar No.: 45717)
The O'Neal Firm, LLP
700 12th Street, NW, Suite 700
Washington, DC 20005
1-866-771-0151 (Phone/Fax)
ardra@theonealfirm.com